# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

––––––––––––––––––

Nº07-CV-2422 (JFB)

––––––––––––––––––

## MARCELLUS MORRIS,

Petitioner,

VERSUS

## PAUL KIKENDALL, SUPERINTENDENT,

Respondent.

––––––––––––––––

**MEMORANDUM AND ORDER**
April 23, 2009

––––––––––––––––

JOSEPH F. BIANCO, District Judge:

Petitioner Marcellus Morris (hereinafter, "petitioner" or "Morris") petitions this Court for a writ of *habeas corpus*, pursuant to 28 U.S.C. § 2254, challenging his conviction in state court. In a judgment rendered on February 21, 2003, following a jury trial in the Supreme Court of the State of New York, Nassau County, Morris was convicted of second-degree assault, second-degree obstruction of governmental administration, and resisting arrest. He was sentenced to a determinate term of seven years' imprisonment, five years' post-release supervision on the assault count, concurrent terms on the remaining counts, fines of $3,500, and restitution of $11,965.64.

Morris challenges his conviction on the following grounds: (1) prosecutorial misconduct and a *Brady* violation; (2) the denial of the right to represent himself at his trial; and (3) government misconduct "so outrageous as to warrant dismissal of the charges." Petitioner also requests an evidentiary hearing.

For the reasons set forth below, the request for an evidentiary hearing is denied, and the petition is denied in its entirety on the merits.

## I. BACKGROUND

### A. The Evidence at Trial

On January 7, 2002, petitioner Marcellus Morris was being held in building "B" at the Nassau County Correctional Facility (hereinafter, "NCC"), housed in the 4th floor of B4B-Block (hereinafter "B block"). The correction officers (hereinafter, "C.O.s" or

"officers") on duty on the morning of January 7th for the 4th floor included: Mark Ridge ("Ridge"), Steve Serpico ("Serpico"), John Luxmore ("Luxmore"), and floor supervisor Robert Brtalik ("Brtalik"). Sean Burns ("Burns") was assigned to the observation tier of the 4th floor ("B-tier"). (Tr. at 248, 385-86, 436, 438, 602, 604, 869-870.)[1] B-tier is located between seventy and one hundred feet away from the main lobby area. (*Id.* at 873.)

An incident occurred at around 10:45 a.m. in the lobby area by the elevator when the medical department called Morris for a medical visit. (*Id.* at 892-93.) In order to enter the medical department from Morris's cell, the petitioner needed to travel through a locked gate (controlled from a "lockbox"), down a hallway, and into an elevator while accompanied by C.O.s.

The Court has adduced the following facts below regarding the incident from the instant petition and the state court record in the case.

### 1. The People's Case

Pursuant to the call for a medical visit, C.O. Luxmore unlocked a gate for Morris to enter the lobby area. (*Id.* at 251.) C.O. Frank Bauer ("Bauer") was assigned to escort Morris to the medical unit and stood at the nearby elevator with a key to keep the elevator open. (*Id.* at 669-72.) On his way to the elevator, Morris cursed at Luxmore and said, "I'll kill you mother f**kers." (*Id.* at 253-54, 350-52, 397, 404, 440-43, 490-91.) Brtalik, hearing this comment, came out of his office, and told Morris to calm down. Morris replied, "F**k

you, old man." (*Id.* at 254, 273, 308-10, 352-53, 394-95, 443-44, 494, 602-06, 611, 629.)

Morris then entered the elevator without permission and refused to exit the elevator when the C.O.s asked him to step out. (*Id.* at 254-55, 274, 313-14, 354-57, 444-45, 496-98, 607-08, 675-76.) Morris then hit Brtalik, knocking him down to the floor, and pinned him to the ground. (*Id.*) Luxmore proceeded to open a door for C.O. Kenneth Kelly ("Kelly") to assist in subduing Morris. (*Id.* at 547-59, 617-18). After Ridge, Serpico, and Luxmore failed to subdue Morris, Brtalik instructed Luxmore to use pepper spray (hereinafter, "OC"). (*Id.*)

At this point, Kelly arrived on the scene to assist in subduing Morris. (*Id.*) In addition, the OC was ineffective, so Ridge sounded an alarm for assistance and grabbed handcuffs and shackles. (*Id.*) Kelly then was able to grab hold of Brtalik and pull him away from Morris to safety. (*Id.* at 553, 618.) Several other officers arrived on the scene, and the officers together were then able to handcuff and shackle Morris. (*Id.* at 261-62, 285, 368-69, 409-10, 462-63, 521, 680-83.) The whole incident lasted five to six minutes. (*Id.*)

After several additional C.O.s arrived on the scene, Morris was detained. Later in the morning, Kelly and C.O. Yannotta escorted Morris to the medical unit for decontamination from the OC that was sprayed in his face. (*Id.* at 415, 517, 528-29, 559-62, 586-91, 600.) Officer Kelly did not notice any injuries to Morris at this time. (*Id.* at 559-62.) Yanotta also testified that Morris walked across the lobby himself and was not dragged to the medical unit, although Morris's vision was impaired from the OC. (*Id.*). In addition, at 12:30 p.m., C.O. Robert Callahan

---

[1] References to "Tr." are to the transcript of the trial in this case.

("Callahan") did not notice any injuries to Morris. Later on, at 6:30 p.m., C.O. James Dantuano ("Dantuano") took photographs of Morris's legs, right foot and ankle, and his head and face. (*Id.* at 743-56.) Dantuano testified that Morris seemed fine, and that he did not notice any visible injuries to Morris. (*Id.*)

Ridge, Serpico, and Luxmore all sustained minor injuries, and Brtalik was taken to the hospital where it was determined that he sustained injuries to his back and neck, including a condition which Brtalik's orthopedic surgeon testified was permanent. (*Id.* at 287, 370, 464, 619-21.)

Burns testified that he never left his assigned post in B-tier to go to the elevator on the defendant's floor. (*Id.* at 869-74.) He heard a disturbance in the lobby area, but was not permitted to leave his post. (*Id.*) Burns further denied being in the elevator with Morris at any point or taking part in any of the events in question on the morning of January 7th. (*Id.* at 968-78.) Several other C.O.s involved in the incident similarly testified that Burns did not leave his post in the observation tier during the incident.

### 2. The Defense's Case

Morris testified that, when he was called for his medical visit at 10:45 a.m. on January 7th, both Burns and Luxmore entered the elevator with him. Prior to entering the elevator, Morris told Luxmore that his actions on the previous day had been "f\*\*ked up." (*Id.* at 894.) Petitioner denies disobeying any direct orders, screaming obscenities at the guards, or attacking any of the officers. (*Id.* 902-03). Morris further testified that, in the elevator, Luxmore sprayed OC in his face. (*Id.*

at 898-99.) In addition, Morris alleges that, unprovoked, the other officers kicked him, punched him, and pulled his hair. (*Id.* at 897-901, 914-17). The alleged assault stopped only when Morris heard someone yell, "That's enough." (*Id.* at 900.) Lastly, Morris alleges that C.O. Burns was in fact in the elevator, participated in the attack, and was not at his post on B-tier as the C.O.s testified. (*Id.* at 898.)

### B. Procedural History

Petitioner was charged with second-degree assault (N.Y. Penal Law § 265.02[4]), second-degree obstruction of governmental administration (N.Y. Penal Law § 195.05), and resisting arrest (N.Y. Penal Law § 205.3). Morris pleaded not guilty to the charges. After a pretrial motion filed on October 21, 2002 for reassignment of counsel was denied, petitioner went to trial in County Court, Nassau County.

On November 8, 2002, the jury found petitioner guilty of all charges. (Tr. at 1137.) Before sentencing, the court denied petitioner's motion to set aside the verdict, under N.Y. Crim. Proc. Law § 330.30(3), in which Morris claimed the prosecution withheld a January 7, 2002 tape and the observation tier logbook. On February 21, 2003, following the jury trial, petitioner was sentenced, as a prior felony offender, to a determinate term of imprisonment of seven years with five years' post-release supervision on the assault count, concurrent terms on the remaining counts, fines of $3,500, and restitution of $11,965.64.

Petitioner filed an appeal raising three claims: (1) the trial court erred in denying petitioner's request to represent himself at trial; (2) the jury engaged in misconduct by

discussing sentencing during deliberations; and (3) the restitution was not supported by sufficient evidence. In addition, petitioner filed a *pro se* supplemental brief raising the following additional claims: (1) the court erred in denying his motion to set aside the verdict because it overlooked "conclusive proof" that the People had failed to disclose all relevant log books; (2) the allegedly withheld log book and video constituted both *Rosario* and *Brady* violations; and (3) petitioner's trial counsel was ineffective for failing to seek sanctions against the Nassau County Sheriff's Department for its failure to produce the subpoenaed log books. The appellate division affirmed the judgment of conviction in a decision dated June 6, 2005. *People v. Morris*, 19 A.D.3d 435 (N.Y. App. Div. 2005).

Petitioner subsequently raised the same claims in his application for leave to appeal to the Court of Appeals, and this application was denied on July 29, 2005. *People v. Morris*, 5 N.Y.3d 792 (N.Y. 2005). Following this decision, petitioner filed an application for reconsideration, arguing that: (1) the prosecution was involved in a conspiracy to maintain his unlawfully obtained conviction, and (2) the assistant district attorney involved in the appeal repeatedly made false representations regarding the log books. On October 17, 2005, the court denied petitioner's application for reconsideration. *People v. Morris*, 5 N.Y.3d 855 (N.Y. 2005).

On January 5, 2006, petitioner filed a *pro se* motion to vacate the judgment against him pursuant to N.Y. Crim. Proc. Law § 440.10, in which he alleged: (1) that the prosecutor used fraud and misrepresentation to secure his conviction; (2) that the record was altered to eliminate improper conduct at trial; and (3)

that his conviction was obtained in violation of his constitutional rights. On May 10, 2006, the County Court denied petitioner's motion. Petitioner's subsequent application for permission to appeal the County Court's May 10, 2006 decision to the Appellate Division was denied on September 6, 2006. *People v. Morris*, A.D. No. 2006-05266 (N.Y. App. Div. 2006).

On June 8, 2007, petitioner filed a motion before this Court for a writ of *habeas corpus*, pursuant to 28 U.S.C. § 2254. Petitioner raises the following claims: (1) prosecutorial misconduct and a *Brady* violation with respect to the allegedly withheld correctional facility materials; (2) the denial of the right to represent himself at his trial; and (3) government misconduct "so outrageous as to warrant dismissal of the charges." Petitioner also requested an evidentiary hearing and appointment of counsel. On August 14, 2007, the Court denied petitioner's motion for appointment of counsel. On September 25, 2007, respondent submitted his opposition to the instant petition. On October 9, 2007, petitioner submitted his reply. The Court has fully considered all the submissions of the parties.

## II. STANDARD OF REVIEW

To determine whether a petitioner is entitled to a writ of *habeas corpus*, a federal court must apply the standard of review set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, which provides, in relevant part:

(d) An application for a writ of habeas corpus on behalf of a person in

custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254. "Clearly established Federal law'" is comprised of "'the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Green v. Travis*, 414 F.3d 288, 296 (2d Cir. 2005) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)).

A decision is "contrary to" clearly established federal law, as determined by the Supreme Court, "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 413; *see also Earley v. Murray*, 451 F.3d 71, 74 (2d Cir. 2006). A decision is an "unreasonable application" of clearly established federal law if a state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that

principle to the facts of [a] prisoner's case." *Williams*, 529 U.S. at 413; *see also Earley*, 451 F.3d at 74.

In particular, AEDPA establishes a deferential standard of review: "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Gilchrist v. O'Keefe*, 260 F.3d 87, 93 (2d Cir. 2001) (quoting *Williams*, 529 U.S. at 411). The Second Circuit added that, while "some increment of incorrectness beyond error is required . . . the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Gilchrist*, 260 F.3d at 93 (quoting *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000)).

Finally, state court factual determinations receive a presumption of correctness if they are "fairly supported by the record." *Williams v. Bartlett*, 44 F.3d 95, 99 (2d Cir. 1994) (citing 28 U.S.C. § 2254(d)(8)).

### III. DISCUSSION[2]

### A. *Brady* and Prosecutorial Misconduct Claim

Petitioner alleges that the prosecution failed to produce at trial certain pieces of evidence and that such conduct warrants *habeas* relief because it violated the

---

[2] Respondent concedes that petitioner's *habeas* petition is timely and that his claims are properly exhausted for *habeas* review. (Respondent's Affidavit, at 6).

prosecution's *Brady* obligations and constituted prosecutorial misconduct. First, petitioner contends that the prosecution did not produce at trial, and has never produced, a videotape of petitioner being escorted to the medical unit after the incident. Although petitioner claims such a video exists, the respondent argues that no such videotape has ever existed and that the only two videos that have ever existed were properly turned over to the defense and introduced at trial. Second, petitioner claims that the prosecution failed to produce the B-tier log book for the date of the incident. Moreover, petitioner contends that he has now obtained the previously undisclosed log book, which he argues demonstrates that Officer Burns was not in B-tier at the time of the incident and, therefore, could have been in the elevator at the time of the incident as testified to by petitioner and trial (and denied by Officer Burns). Respondent counters that the new evidence is not the B-tier log book, which is still missing, and there is nothing in such log book even if it was not missing that could be helpful to the petitioner.

As set forth below, the Court finds petitioner's claims to be entirely without merit. Petitioner has put forth no evidence that this third videotape has ever existed. Similarly, petitioner has put forth no evidence that the prosecution had the missing B-tier log book or that the exhibit now proffered by petitioner is such a log book. Moreover, all of these issues regarding the purported missing video and log book were fully litigated before the jury during the trial. Finally, petitioner has presented no evidence to the state court or this Court that such evidence, even if it existed and was available at trial, would have been favorable to the accused or affected the outcome of the trial in any way. Accordingly,

as discussed in detail below, there is no basis for *habeas* relief on this ground.[3]

(1) Applicable Law

First, with respect to the alleged suppression of evidence, under *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." In order to prevail on a *Brady* claim, petitioner must demonstrate that material evidence favorable to his case was not disclosed to him. *Kyles v. Whitley*, 514 U.S. 419, 437-38 (1995) ("[T]he prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable."). "Such evidence is material 'if

---

[3] As a threshold matter, petitioner requests an evidentiary hearing to resolve "factual disputes" that were purportedly not addressed in state court. (Petitioner's Memorandum of Law, at 20.) With regard to petitioner's motion for an evidentiary hearing, he has made absolutely no showing that his claim relies upon "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or a factual predicate that could not have been previously discovered through the exercise of due diligence." 28 U.S.C. § 2254(e)(2)(A). In particular, as discussed *infra*, with respect to the video and log book, the factual issues surrounding these claims were thoroughly litigated in state court, including at the trial, and petitioner has failed to demonstrate a basis for an evidentiary hearing on *habeas* review in connection with these claims. In short, there is no need for an evidentiary hearing in this case because it is abundantly clear from the record that petitioner's claims have no merit and that there are no grounds for *habeas* relief.

there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (quoting *United States v. Bagley*, 473 U.S. 667, 676 (1985)). Failure to disclose such material merits relief only if the prosecution's failure "undermines confidence in the outcome of the trial." *Kyles*, 514 U.S. at 434 (quoting *Bagley*, 473 U.S. at 678). Thus, the three elements of a *Brady* violation are that: (1) "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching;" (2) "that evidence must have been suppressed by the State, either willfully or inadvertently;" and (3) "prejudice must have ensued." *Strickler*, 527 U.S. at 281-82.

Second, in order to establish a claim for prosecutorial misconduct based on the use of false testimony, the petitioner must establish "(1) there was false testimony, (2) the [prosecutor] knew or should have known that the testimony was false, and (3) there was 'any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" *Thomas v. Kuhlman*, 255 F. Supp. 2d 99, 108 (E.D.N.Y. 2003); *accord Russell v. Rock*, No. 08-CV-1894, 2008 WL 5333327, at *4 (E.D.N.Y. Dec. 19, 2008).

### (2) Purported Missing Video

Petitioner alleged throughout trial, on appeal, and through post-trial motions in state court that an exculpatory video exists of him being taken from the jail to the medical unit after the incident in the elevator on January 7th (hereinafter, the "missing video"). Petitioner claims that this video shows the guards, who testified that Morris assaulted them and caused injury, dragging him out of the elevator and across the floor. Petitioner further alleges that this video will shed doubt on the credibility of the guards because it will show them not as injured as they made it seem in their testimony.

Respondent argues that no such video exists. C.O. Callahan conducted the investigation of the incident and testified that only two videos were taken of Morris, neither of which shows the incident. After the incident at 12:30 p.m. on January 7th, Callahan tried to videotape Morris, but the petitioner refused to cooperate. (Tr. at 772-76, People's Tr. Exh. 16.) This conduct is shown on video (hereinafter, "January 7th tape"). In addition, Callahan took a second video of guards escorting Morris to the medical unit three days later on January 10th (hereinafter, "January 10th tape") for reasons unrelated to the January 7th incident. (Tr. at 776-82, People's Tr. Exh. 17.) Investigator Nicholas Lenoci, assigned to investigate the incident, testified that no videotape was made of the January 7th incident itself and confirmed the January 7th and January 10th tapes. (Tr. at 839-40.) Several C.O.s further testified that the event was not videotaped because jail policy requires taping only "planned use of force." Both the petitioner's complaint of the missing observation tier log and the petitioner's testimony regarding the discrepancy in the video logs were part of the record during trial.

The Court concludes that petitioner's claim regarding the alleged missing videotape does not provide a ground for *habeas* relief. First and foremost, Morris has not established that this third videotape even exists, let alone that the government has suppressed the video. Morris, at numerous points in his brief, alleges that a numbering difference in a video logbook for NCC somehow proves that there

was in fact a third video taken. At trial, Morris testified, and called witnesses to testify that this video does in fact exist, contrary to the testimony of the C.O.s, investigator, and assistant district attorney. All of this testimony was made part of the record for the jury to consider. Thus, petitioner had a full opportunity to attempt to raise doubts about the credibility of the guards, through petitioner's testimony to the jury that such a video exists. However, nothing in the state court record provides credible evidence that the tape ever existed and petitioner's uncorroborated testimony at trial, which was considered by the jury, does not provide a basis for *habeas* relief.

Second, even assuming *arguendo* that the video did exist, there is no basis to conclude that it was favorable to the petitioner or would have possibly affected the outcome of the trial. Here, petitioner alleges only that the video will show the C.O.s walking away from the elevator not as injured as they claimed to be. The petitioner does not allege that the video would/does show the violent incident that occurred in the elevator prior to the C.O.s escorting Morris to the medical unit afterwards. Therefore, petitioner has failed to demonstrate that the purported missing video would have been favorable to him or that there would have been a reasonable probability that it would have affected the outcome of the trial.

(3) The "Newly Discovered" Log Book

Although petitioner similarly contends that *habeas* relief is warranted based upon a "newly discovered" patrol log book, the Court concludes that there is no indication that the log book is what petitioner claims it to be or, even if it were, that it is favorable to the

defense or would have changed the outcome of the trial.

A patrol logbook of the lobby area (hereinafter, "patrol log") was turned over to Morris and entered into evidence during trial. The patrol logbook showed C.O. Luxmore's signature at 10:45 a.m. on January 7th for the area he was assigned to patrol where the incident occurred. During and before trial, both petitioner and the prosecution made several unsuccessful attempts to obtain the patrol logbook from B-tier, where Burns was assigned for the morning of January 7th. (Tr. at 471-73, 636.) During trial, it was on the record that the B-tier log was moved to storage in NCC, that the prosecutor and investigators attempted to locate the log, and that the log could not be found. (Tr. at 212, 217, 471-73, 636.) On February 21, 2003, prior to sentencing, petitioner argued that he now had in his possession the missing observation tier log. (Ex. F to Petitioner's Memorandum of Law.) The alleged observation tier log contained Luxmore's signature at 10:45 a.m., just like the patrol log, and lacked Officer Burns's signature. (*Id.*)

Petitioner's argument is that, because Burns's name did not appear in the "newly discovered" B-tier log at the exact time of the incident in the distant elevator on B-block, Burns might have been in the elevator as Morris testified during trial. Morris also claims there was prosecutorial misconduct because the government possessed the observation tier log during trial and did not turn the document over to the defense.

The petitioner's claim for a *Brady* violation or prosecutorial misconduct based on the "newly discovered" observation tier log is without merit for several reasons. First, the

state court had sufficient basis to doubt petitioner's claim that the newly discovered observation tier log is valid. There is no printed date or location on the document submitted except that on the side of Petitioner's Exh. F, there is handwriting which says "B4" and "1/7/02." (Ex. F. to Petitioner's Memorandum of Law.) In addition, the signature of C.O. Luxmore on the observation tier log at 10:45 a.m. contradicts petitioner's entire theory of why this logbook is exculpatory. The C.O.s and in fact petitioner himself all testified that Luxmore was involved in the incident with Morris in the lobby area by the elevator at 10:45 a.m. Luxmore could not have been in two different places at the same time -- the observation tier and the lobby/elevator area. Thus, there is no reason to believe that the log offered by petitioner is the actual missing B-tier log.

Second, even if the observation tier log was in fact the actual log from the B-tier or the actual log was found and lacked Burns' signature, the petitioner's claim fails because it is not exculpatory. The lack of Officer Burns signature in the observation tier log at exactly 10:45 does not prove that Burns was participating in the incident in the lobby or elevator area at that time. Burns, Serpico, Luxmore, and Ridge all testified that Burns was not in the lobby at the time of the assault. Therefore, even if the "newly discovered" evidence is the B-tier log book, there is no basis to conclude that there was a reasonable probability that it would have changed the outcome of the trial.

Finally, Morris's claim that the government suppressed the B-tier log during trial is unfounded. Morris did make numerous F.O.I.L. requests and motions during trial for the delivery of the observation tier log. The petitioner requested this evidence both before and during trial with a signed judicial subpoena. (Petitioner's Exh. C.) However, the government, investigators, and the C.O.s of NCC all testified throughout trial that the B-tier log had been filed away in storage and could not be found. As stated earlier, the actual validity of the "newly discovered" B-tier log has not been shown by petitioner, and the petitioner provides no evidence that the actual B-tier log was in the possession of the government, investigator, or C.O.s during trial. Thus, any claim of suppression of evidence lacks factual support.

In sum, petitioner's claims of *Brady* violations based upon an alleged missing video and the newly discovered observation tier log have no merit. Similarly, petitioner's claims of prosecutorial misconduct (including allegedly using fraud, false statements and misrepresentations to secure the conviction), stemming from alleged suppression of the evidence, are without merit for the same reasons. The state court's decision regarding these issues was not contrary to, nor an unreasonable application of, clearly established law, as determined by the Supreme Court, nor was the decision based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Thus, petitioner's request for *habeas* relief based upon these grounds is denied.

B. Denial of Right to Self-Representation

Petitioner also contends that his right to self-representation was denied by the state court. As set forth below, a review of the state court record demonstrates that petitioner never made an unequivocal and timely request to represent himself. Accordingly, the state

court's rejection of this claim was not erroneous and does not provide grounds for *habeas* relief.

## (1) Applicable Law

In *Faretta v. California*, the Supreme Court held that the Sixth Amendment of the United States Constitution grants a criminal defendant the right to represent himself at trial *pro se*. *See Faretta v. California*, 422 U.S. 806, 819 (1975). "[T]he Supreme Court declared that this right may be exercised by all criminal defendants who knowingly, voluntarily, and unequivocally waive their right to appointed counsel." *Johnstone v. Kelly*, 808 F.2d 214, 216 (2d Cir. 1986) (citing *Faretta*, 422 U.S. at 835-36). There must be an initial request to proceed *pro se* that is clear and unequivocal in order for a defendant to waive the right to counsel. *See Williams v. Bartlett*, 44 F.3d 95, 100 (2d Cir. 1994). Even if the defendant asserts this right to self-representation, the right may be subsequently waived if the defendant either abandons the request altogether or vacillates on the issue. *Id.* (holding that petitioner must prove not only that application to discharge counsel and proceed *pro se* was clear and unequivocal, but also that the petitioner did not, after the request, waive his right to self-representation by abandonment). If courts allowed equivocal requests, convicted criminals could easily disrupt unfavorable verdicts rendered in trials where they were represented by counsel. *See United States ex rel. Maldonado v. Denno*, 348 F.2d 12, 16 (2d Cir. 1965).

In addition to the defendant knowingly and unequivocally raising the request to proceed *pro se*, the right of a defendant to represent himself at trial must be timely asserted. The Second Circuit has held that the right to proceed *pro se* is unqualified "only if exercised before the commencement of trial." *United States v. Matsushita*, 794 F.2d 46, 51 (2d Cir. 1986) (quoting *Sapienza v. Vincent*, 534 F.2d 1007, 1010 (2d Cir. 1976)); *see also United States v. Brown*, 744 F.2d 905, 908 (2d Cir. 1984). In *Maldonado*, the Second Circuit held that the unqualified right of defendants to have their requests to represent themselves granted exists until a jury is chosen. *Maldonado*, 348 F.2d at 15-16. The court requires that defendants make timely requests to proceed *pro se* to "ensure the orderly administration of justice and prevent the disruption of both the pre-trial proceedings and a criminal trial." *Williams v. Bartlett*, 44 F.3d 95 at 99 (citing *Sapienza*, 534 F.2d at 1010). Thus, after a defendant begins a trial where they are represented by counsel, the Sixth Amendment right to proceed *pro se* is "sharply curtailed." *Maldonado*, 348 F.2d at 15. Once the right to self representation becomes qualified, "[t]here must be a showing that the prejudice to the legitimate interests of the defendant overbalances the potential disruption of proceedings already in progress, with considerable weight being given to the trial judge's assessment of this balance." *Id.* The "reason for the request, the quality of the counsel representing the party, and the party's prior proclivity to substitute counsel are all appropriate criteria to be factored into the balance." *Sapienza*, 534 F.2d at 1010.

The Court will now address petitioner's alleged pre-trial request and requests during trial to represent himself.

## (2) Pre-Trial Proceedings

As discussed in detail below, the Court concludes that the record supports the state court's finding that petitioner's statements at

the October 21, 2002 conference were equivocal regarding any desire to proceed *pro se* and that at no time prior to the trial did petitioner state his request to proceed *pro se* in a clear and unequivocal manner as required under well-established Supreme Court and Second Circuit precedent. Thus, as discussed below, his claim does not provide a ground for *habeas* relief.

On September 26, 2002, petitioner's counsel indicated that she was not ready to proceed with trial because she was still waiting for certain documents that had been subpoenaed from the correction facility. (Sept. 26, 2002 Tr., at 2-3.) Moreover, at the September 26, 2002 conference, the court addressed a letter petitioner had written to the court setting forth complaints about his attorney and requesting assignment of new counsel. In response to that motion, the court stated, "You're entitled to a free attorney, but you're not entitled to a free attorney of your choice. You can't shop the 18-B list. Now, your attorney is working very hard for you. I suggest you cooperate with her." (*Id*. at 12.) The court then re-scheduled the trial for October 21, 2002. (*Id.*)

Subsequently, petitioner filed a written motion for reassignment of counsel, which was calendared for October 28, 2002.[4] (*See*

---

[4] It appears that the motion for new counsel was inadvertently calendared for October 28, 2002, even though the trial was scheduled to begin on October 21, 2002. However, it is clear from the record that Judge Calabrese considered the motion and denied it on October 21, 2002, before the start of trial. In fact, when the court realized on October 24, 2002 during the trial that the motion was still on his calendar, he found it to be moot because it had been decided. (Tr. at 376.) However, petitioner did again complain about his

Ex. P to Petitioner's Memorandum of Law.) On October 21, 2002, petitioner appeared in court for the commencement of trial and addressed the reassignment of counsel issues raised in his earlier letter and formal motion. Petitioner told Judge Calabrese that "me and Ms. Golombek, we have some sort of conflict," noting that Ms. Golombek, his attorney, did not accept his calls or answer his letters. (Oct. 21, 2002 Tr., at 26.) Petitioner further told the Judge: "I mean that's it. Know what I'm saying? We have a conflict. I'd rather represent myself than to continue to have her represent me." (*Id.*) Ms. Golombek then addressed petitioner's complaints, explaining that she attempted to return some of his calls, but that it was difficult to make contact with him. (*Id.* at 27.) Petitioner then repeated that Ms. Golombek had not discussed the case sufficiently with him and stated, "I'd rather represent myself than continue going on with her representing me." (*Id.* at 28.) When asked for his position on that issue, the prosecutor stated that the defendant had a right to represent himself, but took the position that the trial should not be delayed any further. (*Id.* at 28.) The court then replied, "I will not – I think Ms. Golombek is perfectly suited for the trial. I know she will do an exceptionable [sic] job on the trial. I've seen her on trial and seen her on hearings. I feel no hesitation with respect to that." (*Id.* at 28-29.) The judge and the lawyers then proceeded to discuss the various discovery issues that had been raised by the defendant, sent the prospective jurors home for the day, and began the jury selection process the next morning. (*Id.* at 28-39.)

As noted above, under *Maldonado*, petitioner had an unqualified right to represent himself if he made a knowing and

---

attorney at that time. (Tr. at 377.)

unequivocal request to exercise that right in the pre-trial phase. *Maldonado*, 348 F.2d at 15. However, Morris's statements in court did not show a "purposeful choice reflecting an unequivocal intent to forego the assistance of counsel." *Williams v. Bartlett*, 44 F.3d at 100 (quoting *United States v. Tompkins*, 623 F.2d 824, 827-28 (2d Cir. 1980)). Thus, as discussed below, there is no basis to disturb the state court's determination that his request was equivocal.

In the instant case, as noted above, before ever making reference to representing himself, petitioner first tried to have his counsel reassigned in his September 20th letter to the court and in his October 21st motion for reassignment of counsel. The Court recognizes that "[a] request to proceed *pro se* is not equivocal merely because it is an alternative position, advanced as a fall-back to a primary request for different counsel." *Johnstone*, 808 F.2d at 216. However, the context of the reference to self-representation is important in determining whether the reference itself was a clear invocation of the right to self- representation. Here, petitioner did not clearly advance representing himself as a fall-back position. Instead, the passing reference to representing himself was contained in the same statement where he argued that he should be assigned new counsel because of a conflict with his current attorney. It was certainly reasonable for the state court in that context to view the passing reference to self-representation as simply a figurative expression of frustration or hyperbole by petitioner, rather than as an unequivocal attempt to seek to represent himself as an alternative position.

Although the court briefly asked the prosecutor about the self-representation "issue" and the prosecutor stated that petitioner has the right to do that, the court clearly did not view the passing reference as a real request because the court, despite this discussion, never ruled on the self-representation issue. In other words, given the prosecutor's response, it is abundantly clear that the court understood petitioner had a right to represent himself, but viewed the reference as simply frustration given the context and demeanor of petitioner, rather than an unequivocal self-representation request. Instead, he refused to replace petitioner's attorney with a new attorney, as petitioner had requested in writing and at the October 21 conference, finding she was "perfectly suited for the trial" and "will do an exceptionable [sic] job on the trial." (Oct. 21, 2002 Tr. at 28.) The equivocal nature of that passing, impulsive reference is further supported by the fact that petitioner's written submissions to the court made no reference whatsoever to self-representation as an alternative position. Moreover, after the trial court told petitioner that his current attorney was "perfectly suited for the trial" and rejected his request for appointment of new counsel, petitioner did not make any mention of his desire to represent himself even though he continued to personally participate in the conference as it related to the discovery issues.[5] In fact, at no

---

[5] The trial court's failure to view this passing reference as a request to proceed *pro se*, but rather to treat it as frustration over the court's ruling regarding the request for new counsel, is also supported by other portions of the transcript from that day where defendant was warned about "outbursts." (Oct. 21, 2002 Tr. at 32.) Obviously, the trial court was in the best position to evaluate petitioner's demeanor during the conference and, in the context of the entire conference, did not view the passing reference as petitioner clearly invoking his *Faretta* rights. The trial court's

other time prior to trial did petitioner or his appointed counsel ever make any other reference to self-representation.[6] Under such circumstances, in light of the entire pre-trial record – which involved a litany of complaints about his assigned attorney and two written requests by defendant, not seeking to represent himself, but the assignment of new counsel – it was entirely reasonable for the state court to interpret the petitioner's remarks as being in furtherance of his earlier motion and letter for

assignment of new counsel, rather than as a request in the alternative to be able to exercise his right to self-representation. *See, e.g., Burton v. Collins*, 937 F.2d 131, 134 (5th Cir. 1991) ("The fact that there is more than one reasonable interpretation of the dialog between Burton and the trial judge is, in a sense, the best evidence that Burton did not clearly and unequivocally assert his right to self-representation."); *see also United States v. Ibarra*, 236 Fed. Appx. 10, 14 (5th Cir. Mar. 16, 2007) ("[S]tatements delivered contemporaneously with the purported self-representation requests similarly create a reasonable interpretation of the requests other than an interpretation that Ibarra sought to waive his fundamental constitutional right to counsel."). Thus, the record supports the state court's finding that the pre-trial reference to self-representation was equivocal.

The facts in *Johnstone* are clearly distinguishable from the instant situation. In *Johnstone*, the petitioner requested new counsel before the start of trial. However, unlike petitioner in the instant case, petitioner in *Johnstone* was clear and persistent in his request, by among other things, doing the following: (1) after the petitioner's request for new counsel was denied twice, petitioner pushed forward with his request to conduct his own defense, rather than be represented by his lawyer; and (2) petitioner even argued that he was more than capable of conducting his own defense and that his lawyer supported this request. Not only was the petitioner clear and unequivocal in his request after the motion for new counsel was denied, the record in *Johnstone* clearly demonstrated that the trial court understood it to be a request for self-representation because the court proceeded to inquire into the petitioner's age, education, employment, etc. Moreover, even after

---

understanding was further confirmed by the trial court's statement during trial when this issue arose. (Tr. at 570 ("While I have a motion before trial to change the attorney, which was denied, as was the motion that the defendant referred to during trial for re-assignment of counsel, meaning different counsel, I didn't have any motion for defendant to represent himself until we were long into the trial.")

[6] In his Memorandum of Law, petitioner makes reference to a September 23, 2002 pre-trial proceeding, in which petitioner claims he said the following in connection with his motion for reassignment of counsel, "I could not win case [sic] when it seems my lawyer is working for the D.A.'s office and I would be better off representing myself." (Petitioner's Memorandum of Law, at 13.) However, no such proceeding is part of the record. Moreover, in the extensive *Faretta* claim before the Appellate Division on direct appeal, there is no reference to this purported statement at a September 23, 2002 proceeding. (Respondent's Ex. V, at 6-25.) In addition, there is no indication that petitioner was denied the opportunity to develop the factual record on this issue in the state court. Thus, the state court record, which petitioner had every opportunity to develop, indicates that petitioner never made reference to self-representation prior to the October 21, 2002 conference. In any event, even if such an earlier statement were made, it is also an equivocal statement that would not warrant *habeas* relief under *Faretta*.

numerous warnings, the petitioner in *Johnstone* persisted in his requests to proceed *pro se* with the support of his lawyer, who said that the petitioner was intelligent, reads all the minutes, and can proceed. Under such circumstances, the Second Circuit reversed the District Court's denial of the writ of *habeas corpus*, finding that the request was unequivocal.

The factual circumstances in *Williams* are similarly inapposite. In particular, in *Williams*, the Second Circuit concluded that the petitioner was unconstitutionally denied his right to self-representation where he clearly and unequivocally informed the trial judge of his desire to proceed *pro se*:

> The record is clear that on more than one occasion Williams clearly and unambiguously asserted his desire to represent himself at his criminal trial. He elected to forgo counsel before the grand jury. At his arraignment, Williams stated, "I will represent myself." Later, Williams asked that his case be placed on Justice Doyle's docket so he could renew his application to act pro se. As represented by Williams's counsel at the time, the sole purpose of the September 18, 1990 hearing was to address Williams's application to discharge his appointed counsel and proceed *pro se*. At the hearing, Williams declared: "it's . . . my intention[] now to go pro se. Before I wanted to have an attorney, but I can't afford a private attorney. That's why I'm going pro se."

44 F.3d at 100. Given that record in the state court, the Second Circuit found that, "[o]n each of these occasions, Williams's statements show a 'purposeful choice reflecting an unequivocal intent to forego the assistance of counsel.'" *Id.* (quoting *Tompkins*, 623 F.2d at 827-28).

The situation in *Maldonado* also was far different from the factual record here. Specifically, in *Maldonado*, the petitioner made separate, unequivocal requests to represent himself *after* the Court denied his request of assignment of other counsel:

> When the cases were called on the calendar but before the jury had been chosen, both Maldonado and DiBlasi asked for the assignment of other counsel. The trial judge denied their requests. Maldonado then stated, 'Your Honor, if I feel that the case must go on, I want to be able to act as my own attorney. Would you give me that permission, sir?' This request likewise was denied.

348 F.2d at 14. Thus, in *Maldonado*, there was a clear request and a clear denial by the state court of petitioner's right to self-representation.

In the instant case – unlike the petitioners in *Johnstone, Williams, and Maldonado* – petitioner made only a passing, off-the-cuff reference to self-representation while

requesting new counsel and never made any other reference prior to the commencement of jury selection to representing himself, even after his request for appointment of new counsel was denied.

This Court's conclusion on this issue is consistent with numerous other decisions in which courts have found similar passing references, made in the context of a denial of a motion to replace counsel, to be equivocal. *See, e.g., Reese v. Nix*, 942 F.2d 1276, 1281 (8th Cir. 1991) (holding no unequivocal request to self-representation where defendant stated, "Well, I don't want no counsel then," after the trial court denied his motion to substitute counsel and finding that such statement "seem[ed] to be an impulsive response to the trial court's denial of his request for new counsel"); *Burton v. Collins*, 937 F.2d 131, 132-34 (5th Cir. 1991) (holding no unequivocal request for self-representation where defendant's question, "May I represent myself?" was asked after the judge informed the defendant his current counsel would not be replaced); *see also United States v. Pena*, 279 Fed. Appx. 702, 707 (10th Cir. May 27, 2008) ("The sole evidence of such an intention [to represent himsel] is the one question ('[c]an I represent myself?') that Mr. Pena asked in the middle of a colloquy with the judge that primarily concerned his dissatisfaction with his current counsel Mr. Rozan and his request for a new attorney. . . . When the judge did not answer his question about self-representation, Mr. Pena did not pursue the issue in any way: neither in the trial proceedings nor in a written motion did he ever mention self-representation again. Moreover, in his statements to the judge after his question about representing himself, Mr. Pena continued to express his dissatisfaction with Mr. Rozan and his request for a different lawyer. . . . Here, Mr. Pena did not make such an unequivocal and timely request.") (citations omitted); *United States v. Light*, 406 F.3d 995, 999 (8th Cir. 2005) (holding no unequivocal request to self-representation where defendant asked, "What's the rule on representing yourself?" in context of warnings to defendant about his behavior); *United States v. Manthey*, 92 Fed. Appx. 291, 295 (6th Cir. Mar. 17, 2004) ("We do not assess this single, off-the-cuff remark as the clear and unequivocal request to proceed pro se required by *Faretta v. California*. . . .") (citations omitted); *Green v. Prosper*, No. CV 05-8759-JVS (PLA), 2007 WL 4969523, at *5 (C.D. Cal. Dec. 17, 2007) ("the record reflects that petitioner's request to represent himself was not unequivocal because petitioner had previously requested that the trial court appoint new counsel and he was unclear in his request immediately prior to trial whether he was requesting new counsel or requesting to represent himself").

In short, although a request is not equivocal simply because it is an alternative position to a request for new counsel or because it was only mentioned in one proceeding, the purported request in the instant case in the context of the entire record and the October 21st proceeding is far from unequivocal and clear. A review of the record demonstrates that a reasonable interpretation of the proceeding is that the passing reference to representing himself was simply frustration with the denial of his motion and not a real request. Thus, there is no basis to disturb the state court's finding on this issue in the context of a *habeas* petition.[7]

---

[7] This Court concludes that the state court's alternative conclusion that this purported request, made on the morning of jury selection, was untimely (even if unequivocal) also should not be

disturbed in the instant case. Although the Second Circuit has held that the right to self-representation is unqualified if raised before a jury is chosen, this Court must determine on *habeas* review whether the state court unreasonably applied *Supreme Court* precedent, not Second Circuit precedent, although the Second Circuit decisions obviously can guide the court in determining what an unreasonable application is. *See Wilson v. McGinnis*, 413 F.3d 196, 199 (2d Cir. 2005); *accord Mask v. McGinnis*, 252 F.3d 85, 89-90 (2d Cir. 2001) (per curiam). In *Faretta*, the Supreme Court did not indicate a specific time frame for determining whether a *Faretta* request is timely, but rather held that a motion for self-representation made "weeks before trial" is timely. *See Faretta*, 422 U.S. at 835. Moreover, the Supreme Court has never held that a request for self-representation at the start of jury selection is unqualified. Thus, in the instant case, the state court's determination of petitioner's request on the day of jury selection as untimely (even assuming *arguendo* it was unequivocal), was not an unreasonable application of clearly established federal law (as articulated by the Supreme Court in *Faretta*), especially where any such request by petitioner was clearly an effort to delay the trial because of defendant's concerns about discovery issues and the court's decision to deny his motion to obtain a new court-appointed attorney. *See, e.g., Stenson v. Lambert*, 504 F.3d 873, 884 (9th Cir. 2007) ("We have found that a state court's denial of a [*Faretta*] motion made on the morning trial began as untimely was neither contrary to nor an unreasonable application of clearly established federal law. . . . The trial court's determination that Stenson's request to proceed pro se was untimely is not objectively unreasonable under AEDPA.") (citation omitted); *accord Trahan v. Calderon*, 279 Fed. Appx. 476, 2008 WL 2095241, at *1 (9th Cir. May 19, 2008) (rejecting argument that state court unreasonably applied *Faretta* by determining that petitioner's request for self-representation made just before jury selection was untimely); *Wilson v. Yarborough*,

## (3) Request after the Start of Trial

Following the empanelment of the jury, and at other points during the trial, Morris made other references to self-representation. Prior to opening statements, after complaining again about his attorney's purported failure to adequately prepare, Morris stated, "I would rather represent myself, because, if I'm going to lose, I'm going to lose with a fighting battle and represent myself." (Tr. at 219.) Judge Calabrese denied the request for self-representation, stating to his attorney, "His application to relieve you at this point is denied. We are in the middle of the trial." (Tr. at 219-20.) At the end of the day, defense counsel also advised the court that petitioner wanted to ask questions of the witness along with counsel. The court responded, "At this point we started the trial with counsel. I am

93 Fed. Appx. 174, 2004 WL 785014, at *1 n.3 (9th Cir. 2004) (request for self-representation after jury selection, but before jury was empaneled, was "barely timely under Ninth Circuit law" but "the state courts' view of untimeliness is not an unreasonable reading of *Faretta*") (citations omitted); *Menefield v. Tilton*, No. CV 04-9829-GHK (PLA), 2008 WL 2620180, at *8 (C.D. Ca. July 1, 2008); *see also United States v. Edelman*, 458 F.3d 791, 809 (8th Cir. 2006) (finding no abuse of discretion in denying defendant right to represent himself when request was made five days before start of scheduled trial and was done to delay or disrupt trial); *Lewis v. Robinson*, 67 Fed. Appx. 914, 2003 WL 21456238, at *4 (6th Cir. June 20, 2003) (denying *habeas* petition where petitioner first requested to represent himself before jury selection on the day the trial was to begin); *United States v. Pleasant*, 12 Fed. Appx. 262, 2001 WL 391969, at *3 (6th Cir. 2001) (affirming denial of request for self-representation when first request was made on day of trial with prospective jurors standing outside the courtroom).

not going to permit it at this point. That application is denied." (Tr. at 467-68.) Later in the trial, on October 28, 2002, during a cross-examination, Morris's counsel informed the court that Morris wanted to represent himself. Specifically, she stated at side-bar, "Your honor, my client asked me to interrupt my questions. He has given me a note. The note indicates he wishes to represent himself, Sixth Amendment right under the United States Constitution. I told him I had to finish this line of questioning. He indicated he wants to have this officer on the stand and wants the questioning interrupted right now." After the prosecutor stated he had no objection to the petitioner representing himself, the court denied the application: "Well, at this point, he started the trial this way. I'm not going to permit him to question at this point. Application denied." (Tr. at 531.) This issue was raised again later that day, and the court again made clear, citing New York case authority that the application was being denied as untimely: "I have indicated already to you at the bench it's not timely. . . . Once the trial starts, it is within the discretion of the trial court. We are substantially into the trial at this point and the Court will not grant his application to represent himself." (Tr. at 542.) Morris then said, "I have a sixth amendment right. I have told you from day one, since I stepped into this courtroom, we have a conflict of interest. You have a re-assignment motion. I don't know why it's late[,]" (Tr. at 542,) but the court denied his request as untimely. Later the court asked Morris why he wanted to represent himself, Morris responded "I feel I understand the situation better." (Tr. at 566.) The Court then explained: "Again, with respect to that [*i.e.*, self-representation request], under *People v. McIntyre*, 36 N.Y.2d 10, cited in 1974, [o]nce a trial has begun, the

right to change attorneys is severely restricted. While I have a motion before trial to change the attorney, which was denied, as was the motion that the defendant referred to during trial for re-assignment of counsel, meaning different counsel, I didn't have any motion for the defendant to represent himself until we were long into the trial. Once the trial begins, the right is severely constricted and it's granted in the trial Court's discretion and only in compelling circumstances. The – it doesn't seem there are compelling circumstances here. There does seem to be some attempt to delay or to prolong the trial, possibly even to disrupt it." (Tr. at 570-71.)

Thus, although after the trial started, petitioner eventually stated his desire to represent himself in a clear and unequivocal manner (as opposed to the pre-trial stage), such request was not timely asserted. Therefore, Morris's right to proceed *pro se* was "sharply curtailed" and Morris's right to represent himself became a qualified right "with considerable weight being given to the trial judge's assessment." *Sapienza*, 534 F.2d at 1010. As noted above, the trial court exercised its discretion to deny the request as untimely and specifically noted that there appeared to be some attempt to "delay or to prolong the trial, possibly even to disrupt it." (Tr. at 571.) Under these circumstances, there is no basis to conclude that the state court unreasonably applied *Faretta* in determining that the requests for self-representation during the trial were untimely, and its determination that it was done for delay and possibly disruption was not an unreasonable determination of the facts in light of the record. *See, e.g., United States v. Brown*, 744 F.2d 905, 908 (2d Cir. 1984) (affirming denial of mid-trial request by defendant to represent himself and noting the following: "Judge

Leval was well aware of the history of appellant's relationship with his counsel and reasonably concluded not only that his representation by counsel was adequate but also that appellant's representation of himself would have been disruptive of the trial process. Under all the circumstances, the District Court's refusal to permit *pro se* representation during the trial will not be disturbed."); *United States v. Young*, 287 F.3d 1352, 1355 (11th Cir. 2002) ("In this case, the meaningful trial proceedings commenced when the parties selected the jury; therefore, [defendant's] request for self-representation was untimely."); *Hayward v. Godinez*, No. 3:91-cv-00147-LRH-VPC, 2009 WL 905040, at *18 (D. Nev. Mar. 27, 2009) ("In this case, [petitioner's] federal constitutional rights were not violated when his request to represent himself, made on the first day of trial, after the jury was empaneled, was ruled untimely and denied by the trial court."); *Reber v. Conway*, No. CV-06-0047-S-EJL, 2007 WL 4198237, at *4 (D. Idaho Nov. 21, 2007) ("the Idaho Court of Appeals was free to conclude that [petitioner's] request to represent himself, made long after the jury was empaneled and after several witnesses had testified, was untimely"); *Lynch v. Schriro*, No. CIV 05-2436-PHX-DGC (DKD), 2007 WL 865369, at *5 (D. Ariz. Mar. 20, 2007) (denying *habeas* where petitioner made untimely request for self-representation on the morning of trial); *see generally Martinez v. Court of Appeal of Cal., Fourth Appellate Dist.*, 528 U.S. 152, 161-62 (2000) (noting that "most courts" have interpreted *Faretta* to request defendant to invoke right to self-representation "in a timely manner") (citation omitted).

In sum, the Court concludes, based on the Court's careful review of the record, that the state court's decision that the petitioner did not make a "timely unequivocal request" to exercise his constitutional right to self-representation was neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court, and was not based on an unreasonable determination of the facts in light of the entire record.

## C. Outrageous Government Misconduct

Petitioner also claims that *habeas* relief is warranted because of the allegedly outrageous government misconduct during the trial. In particular, petitioner argues that "[t]ampering with evidence, falsifying reports, perjured testimony, Rosario file manipulation, all led to outrageous conduct that should shock the conscience of the court and allow for dismissal of the case." (Petitioner's Memorandum of Law, at 17.) As set forth below, this claim is without merit.

"[P]rosecutorial misconduct cannot give rise to a constitutional claim unless the prosecutor's acts constitute 'egregious misconduct.'" *Miranda v. Bennett*, 322 F.3d 171, 180 (2d Cir. 2003); *see also Floyd v. Meachum*, 907 F.2d 347, 353 (2d Cir. 1990) ("The appropriate standard of review for a claim of prosecutorial misconduct on a writ of habeas corpus is the narrow one of due process, and not the broad exercise of supervisory power.") (internal quotations and citations omitted). In the instant case, petitioner's more generalized prosecutorial misconduct claim essentially repeats the allegations discussed *supra* with respect to the *Brady* claim. As discussed in detail *supra*, there is absolutely no basis in the record to conclude that the government destroyed or suppressed any evidence (such as a video or logbook), nor any basis to conclude that the

government tampered with evidence, falsified reports, perjured testimony, or violated *Rosario*. In short, there are simply no grounds in the record for petitioner's allegations, individually or collectively, of prosecutorial misconduct and no factual basis for any constitutional claim of prosecutorial misconduct.

## IV. CONCLUSION

For the foregoing reasons, petitioner has demonstrated no basis for relief under 28 U.S.C. § 2254. Petitioner has failed to point to any State court ruling that was contrary to, or an unreasonable application of, clearly established federal law, or that resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Accordingly, the instant *habeas* petition is denied in its entirety, including the request for an evidentiary hearing. Because petitioner has failed to make a substantial showing of a denial of a constitutional right, no certificate of appealability shall issue. *See* 28 U.S.C. § 2253(c)(2).

The Clerk of the Court shall enter judgment accordingly and close this case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: April 23, 2009

Central Islip, New York

* * *

Petitioner appears *pro se*. The attorney for respondent is Kathleen M. Rice, District Attorney of Nassau County, by Tammy J. Smiley, Esq. and Margaret E. Mainusch, Esq., Assistant District Attorneys, 262 Old Country Road, Mineola, New York 11501.